1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   JUSTIN VINCENT,                    )    Case No.: 1:18-cv-0549 - JLT
                                         )
12              Plaintiff,               )
                                         )    ORDER GRANTING DEFENDANT'S MOTION
13        v.                             )    FOR SUMMARY JUDGMENT
                                         )
14   CITY OF CALIFORNIA CITY,            )    (Doc. 38)
                                         )
15              Defendant.               )
                                         )
16   _____ )

17          Justin Vincent was terminated from his employment as the Fire Chief of the City of California

18   City. He claims he suffered retaliation and discrimination in violation of California law and that the

19   defendant violated his rights under the First Amendment. Finally, he alleges the City violated the

20   Firefighter's Bill of Rights when firing him.

21          The City contends Plaintiff is unable to succeed on his claims and seeks summary judgment on

22   the remaining claims pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Doc. 38)  Plaintiff

23   filed his opposition to the motion on July 4, 2019 (Doc. 39), to which the City filed a reply on July 11,

24   2019 (Doc. 43).  For the following reasons, the City's motion for summary judgment is **GRANTED**.

25   ///

26   ///

27   ///

28   ///

                                                    1

## I.    Background and Undisputed Material Facts[1]

On March 1, 2017, the City "extended a conditional offer of employment" for the position of Fire Chief to Plaintiff. (UMF 1) "As part of Plaintiff's conditional offer of employment with the City, the City informed Plaintiff that he would be subject to 'one-year of probation that includes a review of [his] performance after six months.'" (UMF 2) "Plaintiff was sworn in as the City's Fire Chief on May 2, 2017. (UMF 4) In addition to Plaintiff's role as Fire Chief, he "was also the City's Lead Arson Investigator, Hazmat Incident Commander, and Fire Code Official." (PSF 118; *see* Doc. 43-1 at 37) Plaintiff admits he was an "at-will employee" of the City. (UMF 3)

Plaintiff "was informed of the City's dire financial condition" after he was hired. (UMF 5) In addition, he "was informed that the City was financially depending on an election that would occur in June 2017 regarding the adoption of a 'parcel tax' that was needed to fund all City operations." (UMF 6) The proposed parcel tax did not pass. (UMF 7)

Plaintiff asserts that once he started as Fire Chief, he "was immediately tasked with working with cannabis businesses seeking permits to build growing and manufacturing facilities in the City." (Doc. 39-5 at 2, Vincent Decl. ¶ 3) He contends that "City officials pressured [him] to be 'business friendly' to cannabis businesses and to allow them to obtain permits, sometimes, without meeting Fire Code requirements." (*See id.*) In addition, Plaintiff reports he encountered business owners expecting preferential treatment, including Josh Meister, who "offered [Plaintiff] all expenses paid trips to Vegas and Lake Havasu," which Plaintiff interpreted as a bribe. (PSF 117) He reported Mr. Meister's offer to Mary Johnson in Human Resources, the City Manager Tom Weil, and Jeannie O'Laughlin but did not report it to police. (*Id.*; *see also* Doc. 41-5 at 25, Vincent Depo. 66:17-20)

In July 2017, "Plaintiff reported to the City Manager in July 2017 that he was concerned Assistant City Manager and Finance Director Jeannie O'Laughlin had a conflict of interest in that her

---

[1] This section is a summary of both the undisputed facts and the parties' positions in this action. The City filed a "Stipulated Statement of Uncontroverted Facts and Conclusions of Law" in support of the motion, reporting it was prepared following meeting and conferring with Plaintiff. (Doc. 38-2; *see also* Doc. 38-6, O'Connell Decl. ¶¶ 10-13) The Court will refer to the undisputed material facts in this statement as "UMF".

The parties also each prepared separate statements of facts to support their respective positions. (Doc. 38-3 [the City]; Doc. 39-2 [Plaintiff]) To the extent any separate facts identified by the parties are undisputed **and the Court found the evidence cited supports the facts identified**, these are identified as "DUF" for the City's Undisputed Facts and "PUF" for Plaintiff's Undisputed Facts.

son was looking for a local position in the marijuana industry."  (PSF 124)

On July 25, 2017, Plaintiff presented a "Marijuana Impact Report" to the City Council, which "included recommendations for training, personnel, and resources needed."  (UMF 8; *see also* PSF 120)  In particular, the "Marijuana Impact Report" identified ten steps to be taken through January 2020, including: hiring a full-time fire marshal and deputy fire marshal, converting three seasonal firefighter positions to full-time positions, building a second station, purchasing "a ladder truck/HAZMAT Engine/and Fire Engine (with associated gear)," hiring additional fire personnel, and hiring a full-time fire inspector.  (UMF 9)

At the July 2017 meeting, "City Council members expressed their concern that agreeing to Plaintiff's requests would be too costly," and "[t]he report was not well received." (UMF 10; PSF 122) "[O]ne department manager expressed concern to Plaintiff that he was going to 'kill the town.'" (*Id.*) However, the City Council voted to hire a full-time fire marshal, which was the first step identified in Plaintiff's report, "and to fund that position from the City's General Fund Reserves."  (UMF 9, 11)

"Plaintiff claims he was first subjected to discriminatory or retaliatory conduct by people associated with the City"—including Mayor Jennifer Wood and Jeannie O'Laughlin—after he presented the "Marijuana Impact Report." (UMF 12-13, 22; *see also* PSF 125) Plaintiff contends O'Laughlin began to act in both a passive aggressive and aggressive manner, "from purposeful denial of needed funds and budgeted items to going against the City Manager and items listed that were supposed to be [going] to [Plaintiff]."  (UMF 13)  In addition, Plaintiff alleged "O'Laughlin would repeatedly remind [him] that he was still on probation and that he needed to ease up on the [m]arijuana industry or he was not going to pass probation." (UMF 14)  O'Laughlin's statements concerning Plaintiff's probation "occurred between July and November 2017 during public hearings where cannabis business owners were present, in O'Laughlin's office, and in then-City Manager Tom Weil's office."  (UMF 15)

On August 28, 2017, Plaintiff had a meeting with O'Laughlin and Mary Johnson, the City's Human Resources Director.  (UMF 16) Plaintiff requested to purchase additional fire badges and asserts that O'Laughlin was "grossly disrespectful" to him when discussing the request.  (*Id.*) "Plaintiff does not claim that O'Laughlin said anything racist to [him] during the … meeting." (UMF

17)  "Plaintiff felt that O'Laughlin's micromanagement and criticism of his spending requests were unwarranted and, in spite of the fact that O'Laughlin did not say anything racist to Plaintiff …, [he] included the following colloquy in an email to Johnson about the meeting:

> She has made this very personal and the continued nasty behavior after she already threatened my probation is making [me] ask why she is treating me so differently.  Is it my age?  Is it the color of my skin?  Is it that she just hates the fire dept?"

(UMF 18)  Johnson then met with O'Laughlin and "counseled her about her behavior."  (UMF 19)  O'Laughlin also received a reprimand.  (*Id.*)

Plaintiff alleges that "Wood began to subject him to discrimination and retaliation" after his report presentation as well.  (UMF 22)  Wood disagreed with the recommendations by Plaintiff in his "Marijuana Impact Report," stating she "did not understand how a City department head could request millions of dollars in funding while the City was in a state of financial crisis."  (UMF 23; Doc. 38-11, Wood Decl. ¶ 8)  Plaintiff contends, "Wood was aggressive towards [him] during council meetings," but he "cannot recall" whether she was only aggressive during meetings that "involved finances or some other topic."  (UMF 25)

On September 11, 2017, the City held a memorial event attended by Plaintiff, Mayor Wood, and other city officials. (*See* UMF 27, PSF 137*; see also* Doc. 15 at 4, ¶ 24)  Following the event, Plaintiff emailed Johnson regarding Wood, stating she exhibited "classless and rude behavior... at the 9/11 memorial service."  (Doc. 39-12 at 1)  He also reported that Wood "refused to sign one [of] the checks for a purchase made by the fire department that was already approved..." and he felt "this pervasive harassment is intentional and aimed at purposefully making [his] life difficult with the end goal of getting [him] to quit[]."  (*Id.*)  Plaintiff informed Johnson that he felt the treatment he received was "creating an intolerable work environment."  (*Id.*)  Plaintiff obtained statements from his crew who reported they witnessed Wood "shaking the hands of every other member of the fire department while [they] were lined up on formation" at the 9/11 memorial and passing by Plaintiff.[2]  (*Id.*; *see also* Doc. 39-14 at 1, 2)  However, it is undisputed that "Wood and Plaintiff both arrived before the

---

[2]The evidence presented by Plaintiff is that Wood shook the hands of all *firefighters.* This is different from the FAC that alleges Wood shook the hands of the other city officials as alleged in the FAC and skipped shaking Plaintiff's hand.  (*Compare* Doc. 39-12 at 1, 2 with Doc. 15 at 4, ¶ 24)

beginning of the September 11, 2017 event and Wood went up to Plaintiff and shook his hand at that time." (UMF 28) In the email to Johnson, Plaintiff did not report he believed the "harassment and treatment" was due to his race. (*See* Doc. 39-12 at 1). Plaintiff also admits that "Wood never made any statements to Plaintiff about his race." (UMF 30)

"On October 3, 2017, during a Director's meeting[,] staff including City Manager Weil witnessed O'Laughlin being mean spirited and unprofessional towards Vincent, grabbing a report out of his hands and then flinging it at him berating him, as if was a child, over a request to send his firemen to paramedic school." (PSF 139, Doc. 43-1 at 48) Three days later, Plaintiff sent a memorandum to the Human Resources Department regarding O'Laughlin's conduct, reporting "[t]he interaction was absolutely humiliating, disrespectful, unwarranted, and extremely hostile." (Doc. 39-18 at 1) Plaintiff indicated:

> [Jeannie O'Laughlin] does not hide her disdain for myself or the fire department and has openly stated that she hopes she can "contract us (the fire department) away to Kern County." I feel that I have exhausted all measures at this point to address the hostile work environment.

(*Id.* at 2) Further, Plaintiff attached the definition of "hostile work environment" found under FEHA to his memo, highlighting in red text that protected traits under California law include race, color, and age. (*Id.* at 3) Nevertheless, Plaintiff admits "O'Laughlin never made any statements to Plaintiff about his race." (UMF 21)

On November 21, 2017, Plaintiff received an employee performance evaluation from Weil. (PSF 144, *see also* Doc. 39-21) In the review, Weil "marked Plaintiff as 'exceeds expectations'" and "meets standards" (*Id.*; Doc. 39-21 at 1-2) Weil noted, "Chief Justin is definitely a hands on individual who doesn't hesitate to lead by example!" (PSF 144; Doc. 39-21 at 4)

At unidentified times, Plaintiff had engaged in "discussions with [his] Fire crew about the rumor that Wood was having an affair with California City Police Lieutenant Frank Huizar." (DSF 81) On November 28, 2017, Weil retired as City Manager (UMF 32), but "right before" this date, Weil told Plaintiff "to stop spreading the rumor that Wood was having an affair" with Huizar. (UMF 29; *see also* Doc. 41-5 at 36, Vincent Depo. 86:18-24)

The City hired Robert Stockwell to serve as Interim City Manager following Weil's retirement.

(UMF 33)  "After Stockwell began working for the City, he had an introductory meeting with every department head."  (UMF 34) Plaintiff provided a copy of the "Marijuana Impact Report" and a binder of information about the fire department during his meeting with Stockwell.  (UMF 35)  Plaintiff believed the meeting was "cordial," and Stockwell appeared "adamant about bolstering [the] Fire Department."  (UMF 36)

"In early December," Stockwell and Plaintiff "had a policy discussion about the circumstances where the City should require cannabis related businesses to install sprinklers."  (UMF 37)  Stockwell believed "facilities that would be used exclusively to grow cannabis could be considered greenhouses, and… the California Fire Code did not mandate the installation of sprinklers."  (UMF 39)  Plaintiff disagreed and thought the City should require such facilities to install sprinklers.  (DSF 84)

At another meeting in early December between Plaintiff, Stockwell, and O'Laughlin, the three discussed "Plaintiff's recommendation to purchase... a ladder truck[] for $1,178,480.00."  (UMF 41) "Stockwell agreed with Plaintiff that there was a need for a fire engine and a ladder truck." (UMF 42) However, both "O'Laughlin and Stockwell stated at one point [during this meeting] that they didn't think it was a very good deal for the ladder truck."  (DSF 87) Plaintiff believed "it was the finance department's job to figure out how to fund the purchase of the ladder truck Plaintiff wanted to purchase and any other expenses that Plaintiff wanted to incur on behalf of the fire department 'at whatever cost.'"  (DSF 86) Plaintiff put this item on the City Council agenda without consulting him and misstated that interest would not accrue for the first two years when, in fact, it would. (Doc. 42-2 at 13-14. This conduct concerned Stockwell (DSF 89)

On December 4, 2017[3], Anna Linn, a City employee, reported to Stockwell that Plaintiff had been in City Hall loudly speaking with other City staff managers about Plaintiff's belief that Wood was having an affair."  (UMF 44, DSF 89)  Linn also "explained to Stockwell that Plaintiff spent significant amounts of time in City Hall going from cubical to cubical gossiping with City staff

---

[3] Plaintiff argues he had the conversation with Linn on December 12, 2017.  (*See* Doc. 39-1 at 5) However, there is no evidence presented that supports December 12 as the date the conversation occurred. The memorandum Stockwell provided to Plaintiff about the conversation was dated December 11. Moreover, Plaintiff testified he believed the conversation occurred "either October or November" and was due to the September 11 event at which he reported the slight inflicted by Mayor Wood. (Vincent Depo. 92:1-7) Thus, Plaintiff's contention is contradicted by the evidence.

members." (DSF 90; Doc. 38-8 at 3, Linn Decl. ¶ 9)  On December 11, 2017, "Stockwell prepared and sent a memorandum to Plaintiff … about a 'Potential Disciplinary Conference.'" (UMF 44) Specifically, the memorandum stated: "It has been reported ... that, while at City Hall in an open office environment, you made comments to the affect that a member of the City Council was involved in an improper relationship with a city employee." (Doc. 38-7 at 9, Stockwell Decl., Exh. A)  The memo informed Plaintiff that he would be given "an opportunity to respond" to the allegation.  (*Id.*)

"On December 13, 2017, and before Stockwell and Plaintiff could arrange to meet with one another about the allegation that Plaintiff had been in City Hall loudly speaking with other City staff members about his belief that Wood was having an affair, Plaintiff had a confrontation with two citizens of the City, Joshua [and] Jason Meister" in the foyer of City Hall. (UMF 45, 47) During the confrontation, the Meisters claimed "Plaintiff had been 'suspended from his previous employment for some type of allegation having to do with children." (DSF 91)  In addition, "Plaintiff and the Meisters discussed parties that the Meisters were allegedly having at their house and to which Plaintiff was invited that the Meister's (sic) described as 'swinger' parties." (DSF 93)  Linn witnessed part of the confrontation between the parties and described it "as loud." (DSF 96)

The Meisters complained to Stockwell about the confrontation, reporting that Plaintiff had "heckled" them and "identified numerous other concerns about Plaintiff's behavior including, but not limited to, the following:

> • Plaintiff was publically [sic] speaking against the marijuana industry and claiming that the fire department would not put out their fires; Plaintiff was publically [sic] disparaging Meister by accusing him of trying to bribe Plaintiff;
>
> • Plaintiff was threatening to call the Meister's insurance company and falsely claim they are committing violations;
>
> • Plaintiff was refusing to answer any questions from the Meisters about codes or compliance; and
>
> • While on duty and in uniform, Plaintiff went to a woman's home and publically [sic] demanded that she stop discussing Plaintiff's affairs."

(UMF 47)  Following the report by the Meisters, which was verified by Linn, "Stockwell sent a new memorandum to Plaintiff on December 14, 2017 informing Plaintiff that the scope of their potential disciplinary conference would be expanded to include the allegations contained in Meister's complaint."

(UMF 48; *see also* Doc. 38-8 at 3, Linn Decl. ¶ 11)

"On December 15, 2017, Plaintiff and his attorney, Oshea Orchid, met with Johnson, Stockwell, and the City Attorney." (UMF 49) "Stockwell was not satisfied with the … meeting because he did not find Plaintiff's explanations to be credible or his apologies to be sincere." (DSF 97; Doc. 39-1 at 10)

"After the December 15, 2017 meeting, and while Stockwell was trying to decide how to deal with the allegations against Plaintiff and Plaintiff's behavior, [an] additional incident occurred…" (DSF 98) "Plaintiff, his fire marshal, and a sergeant from the Police Department went to a juvenile's middle school and … [took] a juvenile into custody for a charge of arson." (UMF 50) When Plaintiff went to the school, he "was dressed in his arson uniform that includes a Kevlar vest" and "was carrying his sidearm." (UMF 51, 52) Plaintiff went to City Hall, still wearing the Kevlar vest and sidearm, after the juvenile was taken into custody. (UMF 53; DSF 99) Plaintiff discussed the arrest with Linn and others at City Hall. (DSF 100)

"Linn reported to Stockwell that Plaintiff appeared at City Hall in what looked like assault equipment carrying a gun and bragged to City staff that he and other armed officers had gone to a junior high school that morning and had dragged two students out of their classrooms in handcuffs who were accused of arson." (DSF 101) After this report, "Stockwell called Police Chief Eric Hurtado … to find out if this had occurred." (DSF 102) Hurtado "informed Stockwell that an arrest had taken place earlier that morning involving a single juvenile accused of arson at his middle school," and "it was [his] understanding that Vincent and police officers had followed the appropriate protocol and had the student in question summoned to the front office where he was to be calmly taken into custody." (Doc. 38-10 at 2, Hurtado Decl. ¶ 4; *see also* DSF 103)

On December 18, 2017, Stockwell met with Plaintiff and gave him a termination letter that stated: "Pursuant to California City Municipal Code Section 2-4.202, I have decided to terminate your employment effective December 18, 2017 due to your failure to satisfactorily complete probation. You shall remain on the City's payroll until December 31, 2017." (UMF 45; Doc. 38-7 at 16) It is undisputed that "Stockwell's December 18, 2017 letter… provided Plaintiff with a reason for his termination." (UMF 70; Doc. 38-2 at 20) "Stockwell did not provide Plaintiff with any other basis for

the decision to terminate his employment. However, Stockwell told City staff that he did not approve of Plaintiff's participation in the raid." (PSF 151, Doc. 43-1 at 53)

"Stockwell alone made the decision to terminate Plaintiff," and he "did not consult with any city employees prior to terminating Plaintiff." (DSF 105, 108; *see* Doc. 39-1 at 13) Stockwell reports the reasons he chose to terminate Plaintiff included:

> • Plaintiff's conduct was unbecoming a director including, but not limited to, (i) appearing at City Hall more than appropriate and gossiping with other City staff members, including about Plaintiff's belief that Wood was having an affair and (ii) having an inappropriate confrontation with a citizen in the City Hall foyer;

> • Plaintiff involved himself in police activity including, but not limited to, responding to police calls at night and bragging that he had dragged two students out of their classrooms; and

> • Plaintiff's inability to understand the financial constraints of the City, including submitting a request for millions of dollars in funding and placing a ladder truck on the City Council agenda without permission after a parcel tax proposal failed that could cause the City to have to lay off significant amounts of staff members.

(DSF 109; *see also* Doc. 38-7 at 5-6, Stockwell Decl., ¶ 27) Plaintiff disputes each of these reasons, asserting they are not credible and "constitut[e] pretext for unlawful discrimination." (Doc. 39-1 at 13)

The California City Municipal Code § 2-4.204 provided that an employee may appeal a disciplinary action, interpretation, or alleged violation of the Code by filing an appeal with the City Clerk within ten working days of receipt of the notice of a disciplinary action." (UMF 71, Doc. 38-2 at 20-21) On December 28, 2017, Plaintiff's counsel sent an email to the City indicating the belief that Plaintiff's "termination [was] unlawful and that the City… failed to follow the proper procedures for terminating Chief Vincent's employment." (UMF 55; *see also* Doc. 39-22 at 1) Plaintiff's counsel requested "the termination be rescinded and Chief Vincent be immediately reinstated." (*Id.*) Counsel for Plaintiff and the City disagreed regarding the governing standards under the municipal code and whether "an opportunity to respond to any charges against him" was required before Plaintiff could be removed from the position of Fire Chief. (*See* Doc. 39-22 at 2) Nevertheless, it is undisputed that "Plaintiff did not file an administrative appeal of his termination." (DSF 111)

Prior to Plaintiff's termination, "Stockwell did not say anything to Plaintiff that was racist." (UMF 61) In addition, "Plaintiff had not accused Stockwell of being a racist" prior to his termination. (UMF 62) "Plaintiff cannot identify a single instance where Stockwell discriminated against or

retaliated against Plaintiff…" (*See* UMF 63)

"In January 2018, Plaintiff met with Stockwell at his house to discuss Plaintiff's termination." (UMF 56)  Plaintiff testified the following occurred:

> I apologized to him for anything I may or may not have done to offend him, to make him rise up to this reason. He clearly stated at the beginning of the meeting that he would not discuss or tell me why I was terminated, and he would never tell me why I was terminated. And that he went into — he asked me how I think I can fix the problem of people now thinking he's a racist for firing me; and that that's an issue that I created and that how would I be able to fix that issue.

(UMF 57; *see also* Vincent Depo. 166:19-167:5 [Doc. 41-5 at 67-68])  When the conversation ended, "the two men shook hands and Plaintiff believed there was a chance he was going to get his job back." (UMF 59)

Remaining claims in his First Amended Complaint, include: (1) retaliation in violation of Cal. Labor Code § 1102.5; (3) retaliation in violation of his First Amendment rights; (4) violations of the Firefighter's Bill of Rights, Cal. Gov't Code § 3254; (5) discrimination in violation of the Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940(a); and (6) retaliation in violation of FEHA.  (*See generally* Doc. 15) The City now seeks summary judgment on all remaining causes of action.  (Doc. 38)

## II.    Legal Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim.  Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted).  The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

Summary judgment, or summary adjudication, should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987). A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact. Fed R. Civ. P. 56(e); *Matsuhita*, 475 U.S. at 586. An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587. The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586 n.11; Fed. R. Civ. P. 56(c). The opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). In resolving a motion for summary judgment, the Court can only consider admissible evidence. *Orr v. Bank of America, NT & SA*, 285

F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  Further, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## III.    Evidence before the Court

### A.    Evidentiary Objections

On a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Further, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4)."

To nearly each of the 48 separate facts identified by Plaintiff, the City raised at least one evidentiary objection. (*See* Doc. 43-1 at 33-57)  In addition, the City raises numerous evidentiary objections to Plaintiff's responses to the City's facts. (*See id.* at 2-32)  The Court declines to rule upon each of the objections individually, as deciding an excessive number of objections would begin "to defeat the objectives of modern summary judgment practice--namely, *promoting judicial efficiency* and avoiding costly litigation." *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110 (E.D. Cal. 2006) (emphasis added).

#### 1.    Hearsay

The City made several objections on the grounds of hearsay, and "hearsay within hearsay," particularly related to statements made in the "Confidential Investigation Report" and Grand Jury documents. (*See, e.g.* Doc. 43-1 at 33, 44-49)

Hearsay is any out-of-court statement, whether oral or written, offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(a), (c).  The Court is unable to consider hearsay evidence in support of or opposing summary judgment, unless an exception to hearsay rule is identified.  *See* Fed. R. Civ. P. 56(c) of ( "an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"); *see also Block v. City of Los Angeles*, 253 F.3d

410, 419 (9th Cir. 2001) (holding that it was an abuse of discretion for the district court, at the summary judgment stage, to consider information from an affidavit based on inadmissible hearsay rather than the affiant's personal knowledge).

The Court recognizes that there may be exceptions to the hearsay objection as to the report itself (*See* e.g., Fed. R. Evid. 803(6), (8)), but Plaintiff fails to lay this foundation or to address the second layer of hearsay. Because Plaintiff relies upon the statements in the Confidential Investigation Report and Grand Jury documents for the truth of the matter asserted and fails to no hearsay exception has been identified, the City's objections thereto are sustained.

### 2. Relevance

The City objects to several of Plaintiff's separate facts as irrelevant to the issues presented in the motion. (*See e.g.,* Doc. 43-1 at 34, 38, 43-44, 46-50, 54) Objections as to relevance are inapplicable at the summary judgment stage, because the Court must determine whether a fact is relevant and material as part of "the summary judgment standard itself." *Burch*, 433 F.Supp.2d at 1119. Consequently, the City's objections on the grounds of relevance are overruled.

### 3. Evidence considered by the Court

To the extent that statements identified by Plaintiff are speculative or represent a legal conclusion, the Court, as a matter of course, has not factored that material into the analysis. *See Burch*, 433 F. Supp.2d at 1119 ("statements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not *facts* and likewise will not be considered on a motion for summary judgment.") (citation omitted, emphasis in original) In the analysis below, the Court has relied upon only evidence it has deemed admissible. In addition, as noted above, the Court will consider only those "facts" that are supported by admissible evidence and the opponent fails to demonstrate through admissible evidence that there is a genuine dispute.[4]

---

[4] The Court has found numerous instances—too numerous to list here—in which Plaintiff's evidence fails to support in whole or in part, the fact asserted or a dispute of the fact. For example, the evidence in support of PUF 117 fails to mention "Eddie Borna." In support of RUF 118, the evidence does not claim Plaintiff was "very well qualified," nor does it mention any of the other titles Plaintiff claims came with his job. Finally, the evidence supports that Plaintiff was called out on one single occasion to assist police. In support of PUF 119, the evidence does not name the councilmember and does not indicate Plaintiff conducted the investigation.

## IV. Discussion and Analysis

The City seeks summary adjudication of all remaining causes of action in the First Amended complaint, including: retaliation in violation of Cal. Labor Code § 1102.5; retaliation in violation of his First Amendment rights; violation of the Firefighter's Bill of Rights, Cal. Gov't Code § 3254; and discrimination and retaliation in violation of the Fair Employment and Housing Act. (Doc. 38)

### A. First Cause of Action: Retaliation in violation of Cal. Labor Code § 1102.5

Plaintiff alleged that he suffered retaliation after engaging in activities protected under Section 1102.5 (Doc. 15 at 7), which is a "whistleblower" statute. *See Green v. Ralee Eng'g Co.,* 19 Cal. 4th 66, 76-77 (1998). The purpose of Section 1102.5 is to "encourage[e] workplace 'whistleblowers,' who may without fear of retaliation report concerns regarding an employer's illegal conduct." *See Collier v. Superior Court*, 228 Cal. App. 3d 1117, 1123 (1991). Specifically, Section 1102.5 provides:

> An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

Cal. Labor Code §1102.5(b). Thus, to establish a prima facie case of retaliation under Section 1102.5, "a plaintiff must show that [he] engaged in protected activity, that [he] was thereafter subjected to adverse employment action by [his] ... employer, and there was a causal link between the two." *Robles v. AgReserves, Inc.*, 158 F.Supp.3d 952, 1008 (E.D. Cal. 2016) (quoting *Soukup v. Law Offices of Herbert Hafif*, 39 Cal.4th 260, 287-88 (2006)). The protection of Section 1102.5 "is not extended to general complaints made about the work environment." *Greer v. Lockheed Martin Corp.*, 855 F. Supp. 2d 979, 989 (N.D. Cal. 2012).

---

These are merely three examples, though the Court has found problems with many, if not most, of the "facts" proposed by Plaintiff and in response to the DUF. For example, in response to DUF 89, Plaintiff indicates that he had a conversation with Linn on December 12, 2017, though the defendant's evidence disputes this, and the evidence Plaintiff cites, does not support this. He claims also that he raised concerns with Linn in that conversation that the alleged affair between Wood and Huizar, "was impacting her decisions about City personnel matters," though there is no evidence identified that supports either that this was occurring, that Plaintiff believed it was occurring or that he said it was occurring. The Court has found absolutely no evidentiary support for this assertion.

At the hearing, counsel first asserted the evidence citations were correct, then attributed the errors to "typos," and then reported that a law clerk inserted the evidentiary citations. As counsel knows (Fed.R.Civ.P.11(b)(3)), this type of conduct violates the obligations to this Court and can result in sanctions. The conduct here has done such a disservice to the client that the Court is refraining from issuing sanctions.

1          1.     Protected activity under section 1102.5

2          A plaintiff engages in protected activity for a report under Section 1102.5 "where the employee

3   has reasonable cause to believe that the information discloses a violation of state or federal statute, or a

4   violation or noncompliance with a state or federal rule or regulation." Cal. Lab. Code § 1102.5(a), (b);

5   *see also Patten v. Grant Joint Union High Sch. Dist*., 134 Cal. App. 4th 1378, 1386 (2005)) (the

6   reporting employee must "reasonably believe []he was disclosing a violation of state or federal law").

7   Where a plaintiff is employed by a government agency and makes such a report "to his or her

8   employer," the report "is a disclosure of information to a government or law enforcement agency

9   pursuant to subdivisions (a) and (b). *Id.*, § 1102.5(e).

10         2.     Plaintiff's activities

11         The City observes, "Plaintiff claims that he engaged in 'protected activity' when Plaintiff and

12  Stockwell had a policy discussion about the circumstances under which the City should require

13  cannabis related businesses to install sprinklers under California Fire Code in 'generalities' and about

14  'theoretical' buildings." (Doc. 38-1 at 25)  The City contends the "discussion does not support a

15  cognizable claim under Section 1102.5, because the provision "does not apply to disclosures related to

16  the debateable wisdom or efficacy of a policy." (*Id.*, citing *Mize-Kurzman v. Marin Community

17  College Dist.,* 202 CalApp.4th 832, 859-860 (2012))  In addition, the City notes the discussion between

18  Stockwell and Plaintiff discussion addressed "concerns [that] were within his job duties as an upper-

19  level administrator," which are not protected.  (*Id.* at 25-26, quoting *Manavian v. Dep't of Justice*, 239

20  Cal.Rptr.3d 710, 726 (2018)).  Further, the City notes that the conversation between Stockwell and

21  Plaintiff cannot be the basis of a Section 1102.5 claim because the "where a supervisor's own conduct

22  is the asserted wrongdoing that an employee is disclosing, a report to that supervisor in the normal

23  course of the employee's duties is not protected." (Doc. 38-1 at 26, citing *Mize-Kurzman*, 202

24  Cal.App.4th at 858; *Edgerly v. City of Oakland*, 211 Cal.App.4th 1191 (2012))

25         Plaintiff does not dispute the City's assertion that his conversation with Stockwell regarding the

26  circumstances where cannabis-related businesses should be required to install sprinklers was not a

27  protected activity under Section 1102.5.  (*See* Doc. 39 at 35-36)  Instead, Plaintiff contends that he

28  engaged in protected activities through the following actions:

- Reported to the City Manager, Human Resources Manager, and City Attorney that he was being offered bribes by Josh Meister (PDMF ¶ 117)

- Reported to the City Manager that he was concerned O'Laughlin had a conflict of interest in that her son was looking for a local position in the marijuana industry. (PDMF ¶ 124)

- Referred violations by Council Member Gomez to the California Department of Fish and Wildlife (PDMF ¶ 119)

- Presented the City Council with a marijuana impact report outlining the fire and safety dangers associated with the cannabis industry indicating that the City could not meet state and federal requirements without additional funding. (PDMF ¶¶ 120 - 121)

- Reported that he was discriminated against and subjected to a hostile work environment because of his race and his refusal to "ease up" on enforcing the fire code. (PDMF ¶¶ 125 - 128[5], 137, 150)

- Reported to the City Manager and City Attorney that Code Enforcement Officer Ron Robbins appeared to be conducting unauthorized searches on the City's TLO account at the Mayor's request and, had his staff refer the case for criminal prosecution. (PDMF ¶ 141)

(Doc. 38 at 35-26) According to Plaintiff, "Although the City failed to document or investigate these reports. Plaintiff will credibly testify as to what he reported and when he did so." (*Id.*)

In response, the City argues these were not protected activities identified by Plaintiff previously in the action. (Doc. 43 at 9-10) The City notes: "From the outset of this action, Plaintiff has based his Section 1102.5 retaliation claim on the false allegation that the Stockwell tried to force Plaintiff to issue permits to cannabis businesses who were not in compliance with his interpretation of the Fire Code." (*Id.* at 9) Specifically, the City notes:

Indeed, in every substantive pleading, Plaintiff stated or paraphrased the following allegation:
Plaintiff was tasked with working with the marijuana businesses seeking permits to build marijuana growing facilities. Plaintiff was pressured by City Officials to be "business friendly" to these marijuana businesses and allow them to obtain permits without meeting the requirements of the Fire Code. Plaintiff refused to do this. Defendant then retaliated against Plaintiff and terminated his

---

[5] Notably, PUF 125-127 do not demonstrate that Plaintiff engaged in protected activities. They demonstrate what other people said or did. The evidence cited in support of PUF 128 does not claim the conduct was due to his skin color. Rather, Plaintiff's August 28, 2017 email states, "[W]hy is she treating me so differently. [sic] Is it my age? Is it the color of my skin? Is it that she just hates the fire dept?" (Doc. 39-13 at 1)

In support of PUF 137, Plaintiff initially testified that he "implied" to Ms. Johnson that the conduct was due to his race, then altered this to claim he expressly told her that the conduct was due to his race. (Plaintiff's Depo 93:11-94:6.) His written report dated September 11, 2017, to Johnson made no such claim. (Doc. 39-12) Also, neither of the reports from the firefighters claimed the conduct was related to Plaintiff's race. (Doc. 39-14) The evidence cited in support of PUF 150 does not indicate that Plaintiff claimed that the treatment was related to race.

employment. Government Claim, Dkt. 15, Exh. 1, p. 4; Complaint, Dkt. 1, ¶ 11, 12, 19; First Amended Complaint, Dkt. 15, ¶¶ 13, 14, 21; Dkt. Opposition to Motion to Dismiss, Dkt. 6, p. 3; *See also* Opposition to Motion to Dismiss, Dkt. 18, p. 4; Motion to Quash Subpoena, Dkt. 31, p. 3; Joint Statement Regarding Plaintiff's Motion to Quash, Dkt. 35, pp. 9-10).

(Doc. 43 at 9-10) The City argues that based upon these claims, it also based its motion for summary adjudication of the first cause of action on the discussion between Plaintiff and Stockwell. (*Id.* at 10) The City contends the new activities identified by Plaintiff are an "attempt to muddle his claim to survive... Summary Judgement." (*Id.*) Even if the Court were to consider the newly identified activities, the City argues, "Plaintiff still cannot establish a prima facie case of retaliation." (*Id.*)

Notably, in the First Amended Complaint, Plaintiff alleged he "engaged in legally protected activities under Labor Code sections 1102.5 and 1102.6, when he reported to the City of California City violations of the California Fire Code, the California City Municipal Code, local rules and ordinances, and other applicable state and federal statutes and regulations." (Doc. 15 at 7, ¶ 51) Plaintiff did not identify any specific reports to the City— or other government agencies such as California Department of Fish and Wildlife—which supported this cause of action. However, the City reasonably believed the claim was based upon the discussion between Plaintiff and Stockwell in light of Plaintiff's repeated reference to being instructed to be "business friendly" to the cannabis businesses, and suffering retaliation for his refusal to do so. (*See e.g.*, Doc. 1 at 3, ¶¶ 11-12; Doc. 6 at 3, Doc. 15 at 3, ¶¶ 13-14; Doc. 35 at 9) As the City argues, the conversation between Stockwell and Plaintiff is not a protected activity under Section 1102.5—and Plaintiff does not dispute this.

To the extent Plaintiff is now identifying new protected activities under Section 1102.5, he is unable to advance a new theory to support his claim for the first time in opposition to summary judgment. *See Pickern v. Pier Pickern*, 457 F.3d 963, 968-69 (9th Cir. 2006) (refusing to allow the plaintiff to advance new theories "presented for the first time in [the plaintiff's] opposition to summary judgment"); *Wasco Prods., Inc. v. Southwall Techs., Inc*., 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings") (internal quotation marks omitted). Because Plaintiff did not address the six activities now identified, he is now unable to base his claim upon these activities.

Regardless, the evidence before the Court does not support Plaintiff's conclusion that he

17

engaged in activities protected under Section 1102.5(b).  First, the evidence does not support the assertion that Plaintiff "[r]eferred  violations by Council Member Gomez to the California Department of Fish and Wildlife."  In support of this "fact," Plaintiff referred to the Grand Jury recommendation "Tale of a City."  (*See* Doc. 39 at 35; Doc. 39-2 at 3 [citing Doc. 39-8 at 5])  However, the Grand Jury's document does not specifically identify the councilmember, and it does not clearly indicate that *Plaintiff* started a case for violations.  (*See* Doc. 39-8 at 5, ¶ F8)  Instead, the document indicates a case was started by "the Code Enforcement Officer," and a case entry indicated, "[w]aiting on response from [Fire] Chief." (*Id.*)  In addition, "The Committee was informed that this case was given to the California Department of Fish and Wildlife for further investigation, for environmental concerns."  (*Id.*) The Court cannot presume, as Plaintiff would have it, that the code enforcement officer referenced was Plaintiff, particularly where other evidence identifies the code enforcement officer as a position separate from Plaintiff's role as Fire Chief.  *See, e.g.* Doc. 39-19 at 3 (discussing Ron Robbin's position as Code Enforcement Officer, and the access his predecessors to the position held to the City's system). Further, there is no evidentiary support that *Plaintiff* reported violations to the Department of Fish and Wildlife, or identified a specific statute or regulation alleged to have been violated.  Thus, Plaintiff fails to show a protected activity based upon a case being given to the state department for investigation.

Likewise, the evidence does not support an assertion that Plaintiff reported the conduct of Ron Robbins to the City Manager or City Attorney, or that Plaintiff was responsible for the referral of the action for criminal prosecution.  Plaintiff merely testified that he and Fire Marshal Jeremy Kosick investigated Robbins and recommended Robbins be terminated.  (Doc. 41-5 at 44, Vincent Depo. 95:1-9)  Kosick reported that he "spoke with Deputy DA Judy Rodgers for advice and if she wanted the case," and does not state that he did so under the direction of Plaintiff. (*See* Doc. 39-19 at 5)  In addition, Kosick indicated that "[i]n speaking with [the] city attorney's office (Vincent, Johnson, and myself were present) they recommended to immediately terminate his employment since he was on probation, so as to minimize further damage and liability to the city." (*Id.*)  Notably, this occurred before the retirement of the prior City Manager and the plaintiff has no evidence that Mr. Stockwell ever knew about this event. (Vincent Depo. at 95:24-96:25) Thus, the evidence identified does not support Plaintiff's new assertion that he is entitled to Section 1102.5 protections for reporting unlawful

conduct by Robbins.

Moreover, Plaintiff fails to identify any specific statute, regulation, or law that he believed was violated by the City or its employees through his remaining "reports" that Plaintiff asserts are entitled to Section 1102.5(b) protections. Significantly, "[t]o have a reasonably based suspicion of illegal activity, the employee must be able to point to some legal foundation for his suspicion—some statute, rule or regulation which may have been violated by the conduct he disclosed." *Fitzgerald v. El Dorado County*, 94 F.Supp. 3d 1155, 1172 (E.D. Cal. 2015) (citing *Love v. Motion Indus., Inc.*, 309 F. Supp. 2d 1128, 1135 (N.D. Cal. 2004) (without citing to "any statute, rule or regulation that may have been violated by the disclosed conduct," the plaintiff lacked "any foundation for the reasonableness of his belief"); *Carter v. Escondido Union High Sch. Dist.*, 148 Cal. App. 4th 922, 933 (2007) (a plaintiff must be able to identify a specific state or federal statute, rule, or regulation which he believed the defendants were violating).

Plaintiff does not point to *any* legal foundation for his identified "reports," and this is fatal to his assertion that he held a reasonable belief that the conduct identified was unlawful or in violation of governing statutes, rules, or regulations. On the other hand, assuming that he reported he believed he was suffering discrimination due to his race, he fails to tie this protected activity to his firing. The evidence claimed to prove "facts" cited to support that he reported racial discrimination, occurred on August 28, 2017 and September 11, 2017, months before Stockwell was hired.

His claim that Mr. Meister attempted to bribe him occurred "probably close to June or mid June or end of June" "Of 2017." (Vincent Depo. at 63:4-17) He presented the "Marijuana Impact Report" on July 25, 2017. (*Id.* at 71:23-72:5) He reported his belief O'Laughlin had a conflict of interest due to her son attempting to obtain a job in the marijuana industry in July 2017. (*Id.* at 38:19-39:11) Stockwell has provided uncontradicted evidence that he did not discuss his firing decision with anyone except the City Attorney and there is no evidence Stockwell was aware of these earlier events.[6] (Stockwell Depo. at 133:22-25) Indeed, Plaintiff testified that before Mr. Weil left, Mr. Weil expressed that he felt Mr.

---

[6] At the hearing, Plaintiff's counsel asserted that there was evidence Stockwell admitted to knowing about these events at the time he fired Plaintiff. The Court has found no evidence to support this assertion. The mere fact that he met with Mayor Wood or HR personnel does not raise an inference—let alone a reasonable inference—that he learned of these earlier events.

Vincent had an "excellent work performance," and that he was doing an "amazing" job. (Vincent Depo. at 138:13-139:5) This does not support that the City was intending retaliation.

There is no evidence that Plaintiff refused to perform an activity because he believed it would violate a specific state or federal rule or regulation. Without a refusal to engage in "unlawful conduct," Plaintiff did not engage in protected activity under Section 1102.5(c). Consequently, because Plaintiff fails to identify any evidence that he engaged in an activity subject to the protections of Section 1102.5, he has failed to establish a necessary element of his claim. *See Robles*, 158 F.Supp.3d at 1008. Thus, summary adjudication of the First Cause of Action is **GRANTED**.

**B.  Third Cause of Action: Violation of the First Amendment**

Plaintiff seeks to state a claim for a violation of his First Amendment rights pursuant to 42 U.S.C. § 1983 ("Section 1983"), which "is a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983. To establish a Section 1983 violation, a plaintiff must show (1) deprivation of a constitutional right and (2) a person who committed the alleged violation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976).

A plaintiff must allege a specific injury was suffered and show causal relationship between the defendant's conduct and the injury suffered. *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976). A person deprives another of a right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). Here, Plaintiff asserts the City violated his rights arising under the Constitution of the United States by unlawfully retaliating against him for engaging in conduct protected by the First Amendment. (Doc. 15-1 at 10-11)

1.  Municipal liability

Municipalities or other governmental bodies may be sued as a "person" under Section 1983 for the deprivation of federal rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, a

local government unit may not be held responsible for the acts of its employees under a respondeat superior theory of liability. *Monell*, 436 U.S. at 691. Rather, a local government entity may only be held liable if it inflicts the injury of which a plaintiff complains. *Gibson v. County of Washoe*, 290 F.3d 1175, 1185 (9th Cir. 2002). Thus, a government entity may be liable under Section 1983 when its policy or custom causes of a deprivation of federal rights. *Id.* at 694.

A plaintiff may . . . establish municipal liability by demonstrating that (1) the constitutional tort was the result of a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity;" (2) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy; or (3) an official with final policy-making authority "delegated that authority to, or ratified the decision of, a subordinate." *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (quoting *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984-85 (9th Cir. 2002)). Here, Plaintiff premises the liability of the City on the fact that he was terminated from his employment by a City official after reporting an affair between Mayor Wood and Lieutenant Frank Huizar.  (*See* Doc. 15 at 10)

### 2. First Amendment Standards

"The First Amendment forbids government officials from retaliating against individuals for speaking out."  *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).  The Supreme Court explained: "[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (citations omitted).  The Ninth Circuit set forth the five-step inquiry to determine whether a public employee's First Amendment rights were violated:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

///

21

3.      Application

A plaintiff bears the burden of showing the speech addressed a matter of public concern, and that "his constitutionally protected speech was a motivating factor in [the] adverse employment action." *Eng*, 552 F.3d at 1070 (citing *Connick v. Myers*, 461 U.S. 138 (1983); *Marable v. Nitchman*, 511 F.3d 924, 930, 932-33 (9th Cir. 2007)).  If a plaintiff meets this burden, the burden shifts to the government to show "adequate justification" for its actions or, in the alternative, that it "would have reached the same adverse employment decision even in the absence of the employee's protected conduct."  *Eng*, 552 F.3d at 1071-72 (citation omitted).

a.      Matter of public concern

Whether an employee's expression may be characterized as a matter of public concern "must be determined by the content, form and context of a given statement, as revealed by the whole record." *Rankin v. McPherson*, 483 U.S. 378, 384-85 (1987) (citation omitted).  In general, speech concerning "individual disputes and grievances and that would be of no relevance to the public's evaluation of the performance of government agencies, is generally not of public concern."  *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 924 (9th Cir. 2004) (citation omitted).  On the other hand, "[s]peech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community."  *Eng*, 552 F.3d at 1071 (quoting *Johnson v. Multnomah Cnty., Oregon*, 48 F.3d 420, 422 (9th Cir. 1995) (internal quotations omitted))).  Although this definition is broad, "there are limits."  *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009). The Ninth Circuit explained: "In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." *Id.* (quoting *Johnson v. Multnomah County*, 48 F.3d 420, 425 (9th Cir. 1995)).

Defendant contends Plaintiff cannot sustain this cause of action because he did not speak on a matter of public concern, but rather engaged in "water cooler" gossip about the mayor.  (Doc. 38-1 at 27)  In response, Plaintiff contends his "speech is protected as it was a matter of 'public concern.'" (Doc. 39 at 29)  In particular, Plaintiff argues the following speech was protected:

22

Plaintiff told Johnson and Linn in the Human Resources Department that Mayor Wood was making biased personnel decisions and suggested the reasons could be Plaintiff's race or the widely held rumor that Wood was engaged in a romantic relationship with Police Lieutenant Frank Huizar. (PDMF ¶¶ 133 – 135) (PRSE ¶¶ 81, 89)

(*Id.*)  According to Plaintiff, his "discussions about Mayor Wood's biased personnel decisions constitutes speech of a public concern."  (*Id.*)

### b.  Statements concerning Plaintiff's race

As an initial matter, the Court notes that Plaintiff did not allege in the FAC that his discussions about racial discrimination were a basis for his First Amendment claim.  In the FAC, Plaintiff alleged in relevant part:

> 77.   Defendant's actions deprived Plaintiff of his rights under the First Amendment to the United States Constitution. Plaintiff brings his claims for damages for the violation of these rights based on 42 U.S.C. § 1983.
>
> 78.   When Plaintiff told Human Resources employee, Anna Linn, that Mayor Wood was engaging in inequitable treatment of City law enforcement personnel and was rumored to be biased in making personnel decisions, due to being engaged in an affair with Lieutenant Frank Huizar, he discussed a matter of public concern.
>
> 79.   In retaliation, Defendant investigated Plaintiff, and terminated his employment.

(Doc. 15 at 10, ¶¶ 77-79) Thus, Plaintiff previously identified *only* the discussions about the rumored affair between Wood and Huizar as a matter of public concern and did not identify the alleged racial discrimination as a matter of public concern.

Significantly, as noted above, Plaintiff cannot advance a new theory to support his claim under the First Amendment for the first time in his opposition to summary judgment.  *See Pickern*, 457 F.3d 968-69 (refusing to allow the plaintiff to advance new theories "presented for the first time in [the plaintiff's] opposition to summary judgment"); *Wasco Prods*, 435 F.3d at 992 ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings") (internal quotation marks omitted); *see also Gonzalez v. City of Federal Way*, 299 F. App'x 708, 710 (9th Cir. 2008) (affirming the court's refusal to consider a claim not in the complaint and "raised for the first time on summary judgment").  Because Plaintiff did not address racial discrimination as a matter of public concern in his complaint, he is now unable to base his claim upon this theory.

Furthermore, the Court is unable to find the undisputed facts support a conclusion that Plaintiff

spoke as a private citizen on a matter of public concern when questioning whether Wood was discriminating against him due to his race. Instead, as Plaintiff contends, these reports were made to human resources personnel and support a conclusion that Plaintiff was speaking "as an employee upon matters only of personal interest" related to Wood's attitude to Plaintiff. See *Connick v. Myers*, 461 U.S. 138, 146-47 (1983).

<u>c.      Rumored affair</u>

Plaintiff asserts he spoke on a matter of public concern when he talked about a rumored affair between two City employees: Mayor Wood and Lieutenant Frank Huzier. (Doc. 15 at 10; Doc. 39 at 29-30) It is undisputed that at unidentified times prior to November 28, 2017, Plaintiff "had discussions with [his] Fire crew about the rumor that Wood was having an affair with California City Police Lieutenant Frank Huizar." (DSF 81) In addition, Plaintiff had a discussion with Anna Linn regarding the rumored affair, which Linn reported to Stockwell. (UMF 44; DSF 89) According to Plaintiff, his speech was "a matter of 'public concern'" because the discussions were "about Mayor Wood's biased personnel decisions." (Doc. 39 at 29)

Notably, comments between coworkers about the sexual relationships of other coworkers are not protected speech. S*ee Sullivan v. Chappius*, 711 F.Supp.2d 279, 285 n. 4 (W.D.N.Y. 2010) (complaints about a state employee's "alleged affair with a subordinate did not involve a matter of public concern"); *Smith v. Citrus County*, 2005 WL 1065545 at *4 (M.D. Fl. Apr. 26, 2005) (explaining that whether a county employee "had 'sexual affairs' with county employees is not a matter of public concern"). In *Belk v. City of Eldon*, 228 F.3d 872, 879 (8th Cir. 2000), Belk brought to the attention of a city alderman that an employee, Carpenter, appeared to be receiving benefits to which she was not entitled, and, rumor had it, the particular city official who allowed this to occur was romantically involved with Carpenter. When Belk's job was ended following her statement to the alderman, she sued and claimed that the action was taken in retaliation. *Id.* In finding that the statements were protected speech, the court found that the allegation of misuse of public funds was the key issue, and the rumored affair was mere "context" for this issue. *Id.*

Previously, Plaintiff suggested the public concern was the decision-making of the mayor, and the rumored affair between Wood and Huizar was the context, alleging: "When Plaintiff told Human

Resources employee, Anna Linn, that Mayor Wood was engaging in inequitable treatment of City law enforcement personnel and was rumored to be *biased in making personnel decisions*, due to being engaged in an affair with Lieutenant Frank Huizar, he discussed a matter of public concern." (Doc. 15 at 10, ¶ 78) (emphasis added) Opposing summary adjudication of this cause of action, Plaintiff again asserts that his "*discussions about Mayor Wood's biased personnel decisions* constitutes speech of a public concern." (Doc. 39 at 30) (emphasis added). However, Plaintiff fails to identify *any* evidence that his discussions were, in fact, about Wood's personnel decisions. (*See* Fn. 4)

To support his assertion, Plaintiff referred to his own deposition testimony and the deposition testimony of Anna Linn. (*See* Doc. 39-1 at 8, citing Vincent Depo. 88:17-92:14 [Doc 41-5 at 37-41], Linn Depo. 31:21-32:9 [Doc. 41-2 at 4-5]). Plaintiff testified he had a conversation with Ms. Linn about the rumored affair in response "to a pointed question she asked" and "acknowledge[]d that [he] had heard of a possible affair happening," but his testimony does not indicate his response related to personnel decisions. (Doc. 41-5 at 39, Vincent Depo. 90:10-:15) Ms. Linn also testified that she had a conversation with Plaintiff regarding the rumored affair stating:

> THE WITNESS: ...I was at my desk. He comes around the cubical. It's open air. It was not in H.R. confidence. And he said, hey, did you hear about the affair that Jennifer Wood had with Lieutenant Huizar?
> And I told him, be quiet, Justin. Yeah. I mean knock it off. I had heard it before. I wasn't shocked by it. It was ridiculous.
> And then he added to that, no, no, no, no. It even happened at the Fire Department. Her bobby pins were on the window sill.
> At that point I told him to stop, and blew it off, but I thought it was ridiculous. And she doesn't wear bobby pins was my first thought. Her hair is short. But, yeah, he was enjoying – he enjoyed –
>
> Q. Telling you?
>
> A. I'm sorry.
>
> MR. O'CONNELL: And you just said "him." You should have said –
>
> THE WITNESS: Yeah. He enjoyed -- he enjoyed sharing it, and there were other people around.
>
> Q. Who was around?
>
> A. I don't know – I don't even know for sure. I know that I think Ruise maybe, and Don Ferguson was in their cubicles at the same time. Everybody was in their cubicles at the same time. I mean Don Ferguson was there, Serena was in a cubicle, Joe Barragan was in a cubicle. We all work in an open-air area.

Q. Where -- what about Jeannie O'Laughlin, was she there?

A. She was in her office with the door opened and it's approximately 10 steps away, like a few feet away.

Q. So, do you believe any of those people could have heard the conversation?

A. Absolutely.

Q. Were there other things that were discussed during this conversation besides the affair?

A. No, because I told him it was ridiculous. Stop talking.

(Doc. 41-2 at 5-6, Linn Depo. 32:3-33:16). Thus, though Plaintiff and Linn disagree regarding who initiated the conversation, the evidence identified by Plaintiff indicates the only statements made to Linn related to the existence of the affair and the details of the rumor. There is no evidence that Plaintiff expressed concern to Linn about "biased personnel decisions" due to the affair. Likewise, there is no testimony or evidence that Plaintiff's conversations with his crew about the rumored affair questioned the mayor's decision-making. (*See* DSF 81; Doc. 41-5 at 36, Vincent Depo. 86:18-24)

Unlike in *Belk*, where the rumor of the affair provided context for the plaintiff's concerns about an employee receiving benefits to which she was not entitled *because of the affair*, there is no evidence that Plaintiff expressed concerns over Wood's decisions due to her alleged affair. Instead, the uncontroverted evidence is that Plaintiff merely repeated—more than once—a rumor about an affair between Wood and Huzier. The undisputed facts and evidence related to the content, form, and context of the statements support a conclusion that Plaintiff's discussions related to the rumored affair were not a matter of public concern, and not protected under the First Amendment. *See Sullivan*, 711 F.Supp.2d at 285, n.4; *Smith*, 2005 WL 1065545 at *4

Because Plaintiff has failed to establish that he spoke on a matter of public concern, he is unable to succeed on a claim for a violation of the First Amendment. The "failure of proof concerning an essential element" is fatal to his First Amendment claim. *See Celotex*, 477 U.S. at 323. Therefore, summary adjudication of the third cause of action is **GRANTED**.

**C.      Fourth Cause of Action: Firefighter's Bill of Rights**

In the FAC, Plaintiff alleged the City "terminated Plaintiff in violation of the Firefighter's Bill of Rights." (Doc. 15 at 11, ¶ 85) In particular, Plaintiff asserted the City was liable for a violation of

Cal. Gov't Code § 3254(c), which provides: "A fire chief shall not be removed by a public agency or appointing authority without providing that person with written notice, the reason or reasons for removal, and an opportunity for administrative appeal."

Previously, Plaintiff asserted that his employment was "at-will" (UMF 3), and as a result this Court found Plaintiff "was not subject to any hearing or other procedural protection in advance of termination," including a probationary period. (*See* Doc. 12 at 8-9) Nevertheless, it is clear all parties agreed Plaintiff was subject to a probationary period of one year and that Plaintiff's offer of employment as Fire Chief "informed Plaintiff that he would be subject to 'one-year [of] probation that includes a review of your performance after six months.'"[7] (UMF 2)

As the City argues, it is undisputed that Stockwell provided Plaintiff written notice of his termination on December 18, 2017. (UMF 45; Doc. 38-7 at 16) This letter indicated Plaintiff's termination was "due to [his] failure to satisfactorily complete probation," as set forth in his offer for employment. (*Id.*; UMF 2) Plaintiff does not dispute the fact that Stockwell's "letter… provided Plaintiff with a reason for his termination." (UMF 70, Doc. 38-2 at 20) Thus, Plaintiff fails to demonstrate the letter did not satisfy the requirements of Section 3254(c), which does not require an employer to set forth each of the bases or facts supporting the reason for termination.

For example, under Section 3254(c), it is sufficient for a fire chief to be informed simply that the termination is due to "incompatibility of management styles," and there is no indication that the terminating agency must specify the ways in which the management style of the fire chief was incompatible with that of the public agency or appointing agency. Likewise, a fire chief could be informed the "reason for removal" was "a result of a change in administration," without identifying the actual change. *See* Cal. Gov't Code § 3254(c). Therefore, the City identified a sufficient reason in compliance with Section 3254(c) in its written notice of Plaintiff's termination.

Finally, Plaintiff does not dispute "that the City's Municipal Code provided Plaintiff with ten working days from receipt of his written notice of termination to file a written appeal of his

---

[7] Notably, it does not appear this part of the offer was presented to the Court when it evaluated Plaintiff's motion to dismiss, because it was not alleged in the complaint. Instead, the Court examined the provisions of the City's municipal code regarding "at will" employees and the fire chief. (Doc. 12 at 7-8)

termination." (Doc. 38-1 at 31; *see also* UMF 71)  The evidence before the Court is not that the City failed to offer an opportunity for an administrative appeal, but rather that Plaintiff did not avail himself of the process through filing a written appeal with the City Clerk.  (*See* UMF 71)

Because the evidence establishes that the City complied with the requirements of the Firefighter's Bill of Rights as set forth in Section 3254(c) and Plaintiff fails to identify a material dispute of facts related to this cause of action, summary adjudication of Plaintiff's fourth claim for relief is **GRANTED**.

### D.    Fifth and Sixth Causes of Action: Discrimination and Retaliation under FEHA

California's Fair Employment and Housing Act affords state employees protection against discrimination and retaliation on any of a wide range of impermissible bases. *McDonald v. Antelope Valley Community College Dist.*, 45 Cal.4th 88, 105 (2008).  Plaintiff contends the City violated FEHA by discriminating against him due to his race and in retaliation.  (Doc. 15 at 12-13)

Due to the similarity between federal and state employment discrimination laws, "California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination . . . based on a theory of disparate treatment." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000) (emphasis in original) (noting California courts' reliance on the federal burden shifting test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Likewise, the shifting burden test applies to claims of retaliation under FEHA.  *See Winarto v. Toshiba America Electronics Components, Inc.,* 274 F.3d 1276, 1284 (9th Cir. 2001).

In general, the plaintiff bears the burden to establish a prima facie case of a violation of the FEHA. *McDonnell Douglas Corp.*, 411 U.S. at 802. "The burden of establishing a prima facie case … is not onerous," and the evidence may be either direct or circumstantial. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *see also DeJung v. Superior* Court, 169 Cal. App. 4th 533, 549 (2008) (noting evidence may be direct or circumstantial). If a plaintiff establishes a prima facie case, "the burden of production, but not persuasion, then shifts to the [defendant] to articulate some legitimate, nondiscriminatory reason for the challenged action." *Hawn v. Executive Jet Mgmt., Inc*., 615 F.3d 1151, 1155 (9th Cir. 2010) (explaining the burden as it related to a claim for discrimination under federal law); *see also McDonnell Douglas Corp*, 411 U.S. at 803.  If the defendant carries this burden,

28

the inquiry does not end. Rather, the burden shifts back to the plaintiff to demonstrate the reasons proffered by defendant are pretextual. *McDonnell Douglas Corp.*, 411 U.S. at 805. Consequently, the plaintiff has "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [him]." *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 142 (2000).

Notably, however, when an employer moves for summary judgment on a FEHA claim, "'the burden is reversed . . . because the defendant who seeks summary judgment bears the initial burden.'" *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 745 (9th Cir. 2011) (quoting *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 224 (1999)); *see also Martin v. Lockheed Missiles & Space Co.*, 29 Cal. App. 4th 1718, 1730 (1994) ("A defendant seeking summary judgment must bear the initial burden of showing that the action has no merit, and the plaintiff will not be required to respond unless and until the defendant has borne that burden"). Thus, the Ninth Circuit determined that to prevail on summary judgment, "the employer is required to show either that (1) plaintiff could not establish one of the elements of [the] FEHA claim or (2) there was a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's employment." *Lucent Techs.*, 642 F.3d at 754 (quoting *Avila v. Cont'l Airlines, Inc.*, 82 Cal. Rptr. 3d 440, 449 (2008)).

### 1. Discrimination

Plaintiff's claim for discrimination in violation in FEHA is based upon disparate treatment.[8] (Doc. 15 at 12) Disparate treatment is "*intentional* discrimination against one or more persons on prohibited grounds." *Guz*, 24 Cal. 4th at 354 n.20 (emphasis in original). Prohibited discrimination based on disparate treatment occurs when an "employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *Int'l Board of Teamsters v. United States*, 431 U.S. 324, 335-336, n.15 (1977). "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Id.*

Generally, to establish a prima facie case of discrimination under FEHA, a plaintiff must

---

[8] In the FAC, Plaintiff indicates his claim is based upon Section 12940(a). (Doc. 15 at 12) Under FEHA, disparate treatment and harassment/hostile work environment fall under separate statutory prohibitions. Cal. Gov. Code § 12940(a) [discrimination/ disparate treatment], § 12940(j)(1) [harassment]. Consequently, California courts have distinguished discriminatory acts from harassing acts and hostile work environment claims. *See Reno v. Baird,* 18 Cal. 4th 640, 645-647 (1998). Because Plaintiff indicates his claim is based upon Section 12940(a), the Court addresses only the standards related to disparate treatment.

provide evidence that:

> (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive.

*Guz*, 24 Cal. 4th at 355. The City argues Plaintiff cannot establish the required elements and thus "cannot establish a prima facie case of discrimination." (Doc. 38-1 at 21-22)

### a.    Member of protected class

Notably, there is no stipulated fact or evidence in the record identified by the parties related to Plaintiff's race or status as a member of a protected class. However, both parties identify Plaintiff as an African-American. (*See* Doc. 38-1 at 21; Doc. 39 at 5) Further, the City acknowledges "Plaintiff is a member of a protected class." (Doc. 38-1 at 21)

### b.    Plaintiff's performance in the position

"[T]he City disputes that Plaintiff can establish he was otherwise performing his duties competently." (Doc. 38-1 at 21) However, the City does not focus its analysis on this element, instead challenging his ability to "identify circumstances that suggest the City had a discriminatory motive." (*Id.*) Accordingly, for purposes of this motion, the Court presumes this element is satisfied.

### c.    Adverse employment action

The City reports "there is no dispute that Plaintiff suffered an adverse employment action when the City terminated him." (Doc. 38-1 at 21) Indeed, "termination of an employment is a quintessential example of an adverse employment action." *Trulsson v. County of San Joaquin DA's Office*, 49 F. Supp. 3d 685 (E.D. Cal. 2014) (citation omitted).

### d.    Circumstance suggesting discriminatory motive

The City argues that "Plaintiff has not, and cannot, identify circumstances that suggest the City had a discriminatory motive for his termination." (Doc. 38-1 at 21) The City contends:

> The only people Plaintiff alleges exhibited any kind of alleged discriminatory animus towards him from the date he was hired on May 2, 2017 until Stockwell was hired on November 28, 2017 were O'Laughlin and Wood. Indeed, Plaintiff admits that for the first three months of his employment, no one subjected him to any discriminatory conduct. Plaintiff further admits that then-mayor Wood and then-finance director O'Laughlin only began to subject him to discrimination after he requested millions of dollars in immediate funding for his fire department despite the failure of the parcel tax

proposal. Still, and even pursuant to Plaintiff's own description, the "discrimination" that he allegedly experienced did not involve a single statement about his race. Instead, Plaintiff believes that Wood and O'Laughlin were discriminating against him because they did not agree with his funding requests and Wood did not shake Plaintiff's hand for a second time at a September 11 memorial event.

(Doc. 38-1 at 21) According to the City, "[n]one of these facts suggest that either Wood or O'Laughlin held a discriminatory animus towards Plaintiff." (*Id.*) Further, the City argues that even if Plaintiff presented evidence that Wood or O'Laughlin held a discriminatory animus "such evidence would be irrelevant" because "Stockwell made the decision to terminate Plaintiff without consulting with any other City employees or council members including Wood or O'Laughlin." (*Id.* at 21-22) The City maintains Plaintiff is unable to show Stockwell had a discriminatory motive, because "Stockwell did not say anything racist to Plaintiff," and Plaintiff described Stockwell as being "cordial with Plaintiff during their meetings." (*Id.* at 22)

Plaintiff argues: he "can show sufficient circumstances to suggest a discriminatory motive. Plaintiff can establish this by showing the close temporal proximity between his protected activity and his termination, along with the lack of evidence or documentation about the alleged performance deficiencies of Plaintiff." (Doc. 39 at 23) Plaintiff contends,

Defendant incorrectly claims that Plaintiff must prove that Stockwell had a discriminatory motive to terminate him. In fact, at the summary judgment stage, Plaintiff need only raise genuine issues of material fact to survive Defendant's Motion. Such disputed issues exist here as to Plaintiff's performance and Stockwell's motives for terminating him.

(*Id.*) Further, Plaintiff asserts that though Stockwell did not say anything racist to him, "it is more likely than not that discrimination was the true motive" for his termination. (*Id.* at 23-24) In support of this contention, Plaintiff observes: "the Third Circuit Court of Appeals explained; '[d]iscrimination continues to pollute the social and economic mainstream of American Life, and is often simply masked in more subtle forms. It has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior. In other words, while discriminatory conduct persists, violators have learned not to leave the proverbial 'smoking gun' behind." (*Id.* at 24, quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3rd. Cir. 1996)).

Plaintiff ignores the evidence presented in *Aman* and its holding. The *Aman* court summarized

the evidence as follows:

> Considered in the light most favorable to them, Aman and Johnson have produced sufficient evidence so that a reasonable jury could conclude that the working environment at Cort Furniture was pervaded by discriminatory "intimidation, ridicule, and insult." *Harris*, 510 U.S. at ——, 114 S.Ct. at 370, 126 L.Ed.2d at 301. The plaintiffs' evidence demonstrates that from 1986 through 1992, employees of Cort Furniture made inherently racist remarks. Aman and Johnson were referred to as "another one," "one of them," "that one in there," and "all of you." Other black employees were harassed on a daily basis by employees at Cort Furniture, who hurled insults such as "don't touch anything," and "don't steal." Aman and Johnson were also subjected to apparently false accusations of favoritism, incompetence, and were made to do menial jobs. The evidence of record shows that white employees were not treated in a similar fashion. In addition, several employees refused to deal with Aman even in matters where she was directly responsible for approving a customer's credit, and these employees were never reprimanded even though their actions were in direct violation of company policy.

> Cort Furniture argued, and the district court agreed, that any racial harassment ended in 1989 because by then many of the individuals who had made these remarks were no longer employed by Cort Furniture. If that were true, then Aman and Johnson's claims based solely on those incidents would be time-barred. But in addition to many other instances of abusive and harassing behavior, Aman and Johnson point to several particularly troubling comments made in 1991 by current management level employees.

> First, in a discussion with Johnson, Jim Newton, the district controller, stated that if things were not resolved with Aman, "we're going to have to come up there and get rid of all of you." App. at 41. When asked whom he meant by "all of you," Newton refused to answer. *Id.* Second, Robert Kurtz, the general manager, after slamming his hand on Aman's desk, told her that he knew all about her and two other employees. The only factor the three shared in common was their race. Id. at 316. Third, in a district meeting attended by all administrative, sales, and warehouse employees, Kurtz stated that "the blacks are against the whites," and that if anyone did not like it at Cort Furniture, they could leave. *Id.* at 323.

*Id*. at 1082. The Court then held,

> The district court's conclusion that harassment ended in 1989 appears to be based upon a belief that these later comments were not racially motivated. *Aman*, *1083 slip op. at 12. In our view, however, the use of "code words" can, under circumstances such as we encounter here, violate Title VII. Indeed, a reasonable jury could conclude that the intent to discriminate is implicit in these comments. Cf. Andrews, 895 F.2d at 1482 n. 3 ("The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course."). There are no talismanic expressions which must be invoked as a condition-precedent to the application of laws designed to protect against discrimination. The words themselves are only relevant for what they reveal—the intent of the speaker. See *Futrell v. J.I. Case*, 38 F.3d 342, 347 (7th Cir.1994) (holding that statements like "sharp young people" and that the employee was not a "forward enough thinker" could reasonably be interpreted as evidence of bias under the ADEA). A reasonable jury could find that statements like the ones allegedly made in this case send a clear message and carry the distinct tone of racial motivations and implications. They could be seen as conveying the message that members of a particular race are disfavored and that members of that race are, therefore, not full and

32

> equal members of the workplace. As we have held, the pervasive use of derogatory and insulting terms directed at members of a protected class generally, and addressed to those employees personally, may serve as evidence of a hostile environment. Andrews, 895 F.2d at 1485. Moreover, a reasonable jury could conclude that Kurtz's statement that "the blacks are against the whites" represents management's explicit recognition of a racially hostile environment at Cort Furniture.

*Id*. at 1082-1083. Then Court noted that in addition to this overt conduct, there were other incidents described by the plaintiffs that could reasonably be attributed to racial discrimination. *Id*. at 1083.

Unlike in *Aman*, the plaintiff here would have the Court presume that because he is of African American descent, the conduct by those at issue here, *had* to be motivated by his race despite the absolute dearth of any evidence upon which this presumption could be based.

Plaintiff errs in identifying the standard at the summary judgment stage. Though it is true that a party opposing summary adjudication has the burden to identify a genuine issue of material fact, there must be more than "some metaphysical doubt as to the material facts." *Matsuhita*, 475 U.S. at 587. Further, the "failure of proof concerning an essential element" in a claim results in a finding that summary adjudication is appropriate. *Celotex*, 477 U.S. at 323. Thus, with a FEHA claim, summary adjudication is appropriate where "the plaintiff could not establish one of the elements of [the] FEHA claim." *Lucent Techs.*, 642 F.3d at 754 (citation omitted) As noted above, the elements of a FEHA claim may be established with either direct evidence or indirect (circumstantial) evidence. *See Burdine*, 450 U.S. at 253 (1981); *DeJung*, 169 Cal. App. 4th at 549.

### i. Direct evidence

"Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." *DeJung*, 169 Cal. App. 4th at 550; *see also Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (same). Direct evidence "typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005). "Comments demonstrating discriminatory animus may be found to be direct evidence if there is evidence of a causal relationship between the comments and the adverse job action at issue." *DeJung*, 169 Cal. App. 4th at 550.

Plaintiff does not identify direct evidence in the record of discrimination. It is undisputed that Wood and O'Laughlin "never made any statements to Plaintiff about his race." (UMF 21, 30)

Likewise, Plaintiff acknowledges that "Stockwell did not say anything to [him] that was racist" prior to his termination. (UMF 61) Consequently, the Court must determine if there is indirect or circumstantial evidence suggesting a discriminatory motive.

*ii.*     *Indirect evidence*

In a claim based upon disparate treatment, a plaintiff may show circumstances suggesting discriminatory motive by showing he was "treated differently from similarly-situated" individuals. *See Lewis v. City of Fresno*, 834 F.Supp.2d 990, 999 (E.D. Cal. 2011) (evaluating a FEHA claim); *Fonseca v. Sysco Food Services of Arizona, Inc.*, 374 F.3d 840, 847 (9th Cir. 2004) (evaluating a federal discrimination claim, and noting a plaintiff could present evidence that "similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination").

Plaintiff appears to confuse his discrimination claim with his *retaliation* claim under FEHA, stating he "can show sufficient circumstances to suggest a discriminatory motive… by showing the close temporal proximity *between his protected activity and his termination*." (Doc. 39 at 24, emphasis added). In addition, Plaintiff suggests that racism has "polluted" society, and as a result the Court should presume his race was a motivation for his termination. (*Id.*) These contentions are insufficient to demonstrate circumstances suggesting Plaintiff suffered disparate treatment.

Though Plaintiff indicated in his FAC that his claim for disparate treatment was supported by the fact that "City officials refused to shake his hand, denigrated his recommendations and communicated to the community that he was not worthy of the same respect afforded other City officials" (Doc. 15 at 12, ¶ 92), the evidence before the Court does not support these contentions. It is undisputed that Wood did, in fact, shake Plaintiff's hand at the September 11 event. (UMF 28) In addition, there is no evidence identified that Plaintiff was treated differently from other department heads who were of different races than Plaintiff. For example, although Plaintiff reported that the mayor refused to sign a check "for a purchase made by the fire department that was already approved" and believed this supported a claim for workplace harassment (Doc. 39-12 at 1), there is no evidence that other department heads did not encounter the same difficulty, given the financial crisis the City was suffering. Plaintiff, himself, presents evidence that Wood disliked many people within the City

staff and treated them with hostility (*See e.g.,* Doc 39-6 at 70-71), but fails to explain why this does not demonstrate he was treated similarly to others.  Further, the City presents evidence, which Plaintiff does not counter, that O'Laughlin was "abrasive with all City staff members and directors, particularly where that discussion involved an expense request."  (Doc. 38-9 at 2, Johnson Decl. ¶ 5)

The only "evidence" that Plaintiff offers to support his contention that the City's actions were racially motivated is the fact that he is African-American.  He does not identify any evidence related to the treatment received by similarly situated individuals—such as other department heads—or identify how that treatment was different than that of Plaintiff.  Consequently, as the City argues, Plaintiff fails to establish a prima facie case for disparate treatment because there is no evidence of a "circumstance suggest[ing] discriminatory motive."  *See Guz*, 24 Cal. 4th at 355. Because Plaintiff is unable to establish a prima facie case for discrimination based upon disparate treatment, summary adjudication of the fifth cause of action is appropriate.

### 2.     Sixth Cause of Action: Retaliation

To establish a prima facie case for retaliation in violation of FEHA, a plaintiff must demonstrate "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005).  The City argues Plaintiff is unable to establish each of these elements because "Plaintiff did not make any cognizable complaints of discrimination" and "the undisputed facts demonstrated that there is no causal link between Plaintiff's alleged complaints of discrimination and his termination."[9]  (Doc. 38-1 at 23)

#### a.     Protected activity

An individual has engaged in "protected activity" when he "opposed any practices forbidden under [FEHA] or . . . filed a complaint, testified, or assisted in any proceeding under the [FEHA]." Cal. Gov. Code § 12940(h).

Plaintiff argues this element is satisfied because "he participated in protected activity when he complained to management at the City that he believed he was being subjected to race discrimination."

---

[9] Again, there is no dispute that Plaintiff suffered an adverse employment action.

(Doc. 39 at 20) According to Plaintiff,

> Defendant erroneously states in their Motion "the only complaints of discrimination were concerning O'Laughlin and Wood before the City hired Stockwell". Motion @ p.15. During the 2017 year, Plaintiff made multiple reports to Human Resources Manager Mary Johnson that he was being discriminated against because of his race. (PDMF ¶¶ 137, 140) On or about December 12, 2017, Plaintiff reported to Linn he was being treated unfairly by Mayor Wood because of his race. (PRSE ¶ 81) On December 15, 2017, just three days before he was terminated, Plaintiff reported to Stockwell, Johnson and the City Attorney that he was being discriminated against. (PDMF ¶ 150) Stockwell later indicated that he took this report to mean that Plaintiff was accusing Stockwell of being racist. (PDMF ¶ 156)

(Doc. 39 at 20-21) Significantly, this summary by Plaintiff is a clear misrepresentation of the evidence before the Court and cited testimony.

Neither Plaintiff nor Linn testified that their conversation mentioned Plaintiff's race or his belief that the treatment he received was because of his race. At most, Plaintiff testified that he complained of receiving "disparate treatment" to Linn. (Doc. 41-5 at 38-39, Vincent Depo. 88:17- 92:14 [indicating that Plaintiff answered questions from Linn following her "visible acknowledgement of the disparate treatment [he] was receiving," such as the mayor's failure to shake his hand]) Although Plaintiff also cited Linn's testimony, she testified their conversation was limited to Plaintiff discussing the rumored affair. (*See* Doc. 41-2 at 4-5, Linn Depo. 31:21-32:9)

More troubling is Plaintiff's assertion that he reported he was being discriminated against to Stockwell, Johnson and the City Attorney "just three days before he was terminated," and that Stockwell "took this report to mean that Plaintiff was accusing Stockwell of being racist." The evidence before the Court—including the very evidence cited by Plaintiff—does not support these allegations. In the deposition testimony cited, Plaintiff does not report that "he believed he was subjected to disparate treatment because of his race." (*Compare* Doc. 39-2 at 11, PDMF ¶ 150 *with* Doc. 41-5 at 19-20, 35, 53, Vincent Depo., 61:17-62:21 [indicating he discussed "threats" from O'Laughlin], 85:6-22 [discussing the rumored affair], 108:2-7] [stating he believed that the City investigated a conversation he had with Human Resources and the conversation with the Meisters])

In addition, there is no evidence that Stockwell took any statements from the meeting to mean that Plaintiff accused Stockwell of racial discrimination. To the contrary, Stockwell specifically testified that Plaintiff did not say anything about racism to the City before being terminated, and

Plaintiff first accused Stockwell of being racist "[i]n the media *after his termination.*" (Doc. 41-3 at 11, Stockwell Depo. 152:11-15) (emphasis added). There is no evidence that Plaintiff reported discrimination to City officials "just three days before he was terminated."

Nevertheless, the Court notes that Plaintiff complained to Human Resources of the treatment he received from Wood on September 11, 2017; and reported the treatment from O'Laughlin on August 28, 2017 and October 6, 2017. (Doc. 39-12 at 1; Doc. 39-18 at 1-3) In the report regarding Wood, Plaintiff stated he felt the treatment he received was "creating an intolerable work environment," but did not reported he believed the "harassment and treatment" was due to his race. (Doc. 39-12 at 1) In the August 2017 report regarding O'Laughlin, Plaintiff stated:

> She has made this very personal and the continued nasty behavior after she already threatened my probation is making [me] ask why she is treating me so differently. Is it my age? Is it the color of my skin? Is it that she just hates the fire dept?"

(UMF 18) In October 2017, Plaintiff stated O'Laughlin did "not hide her disdain for [Plaintiff] or the fire department" and he highlighted in red text provisions of California law indicating protected traits include race, color, and age. (Doc. 39-18 at 2, 3) Thus, the reports to Human Resources against O'Laughlin include Plaintiff's belief that adverse treatment from O'Laughlin may be based, at least in part, on his race.

Taking the evidence in the light most favorable to Plaintiff, the Court finds Plaintiff engaged in protected activity through reporting discrimination on the basis of race.

### b. Causal link

"To establish causation, the plaintiff must show by a preponderance of the evidence that engaging in the protected activity was one of the reasons for the adverse employment decision and that but for such activity the decision would not have been made." *Kraus v. Presidio Trust Facilities Division/Residential Management Branch*, 704 F. Supp. 2d 859 (N.D. Cal. 2010) (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002)).

The requisite causation may be inferred from timing alone an adverse employment action follows on the heels of protected activity. *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1112-13 (2007). Noting a court may infer causation, Plaintiff asserts:

> Defendant argues that Plaintiff cannot identify a protected activity on which he can

base his retaliation cause of action and that there is no causal link. However, the record reflects that Plaintiff's protected activity took place when he made reports to Johnson, Linn, Stockwell and the City's Attorney that he was being discriminated against because of his race. (PDMF ¶¶ 137, 140, 156, 160) Additionally, Stockwell testified that he believed Plaintiff was accusing him personally of being racist. (PDMF ¶ 156)

The causal link between a protected activity and the alleged retaliatory action can be inferred from timing alone, when there is a close proximity between the two. *Thomas v. City of Beaverton* (9th Cir. 2004) 379 F.3d 802, 812. Here, Plaintiff was terminated on December 18, 2017, less than thirty (30) days after Plaintiff received an "exceeds expectations" performance appraisal on November 21, 2017, and only three (3) days after Plaintiff had reported to City Manager Stockwell that he believed he was being discriminated against. (*see above*)

(Doc. 39 at 22) However, as discussed above, Plaintiff failed to identify *any* evidence in the record that such a report occurred, or that it occurred three days before his termination.[10] Further, Stockwell testified the first knowledge he had of Plaintiff accusing him of racism occurred after Plaintiff's termination, when he went to the media. (Doc. 41-3 at 11, Stockwell Depo. 152:11-15) Consequently, Plaintiff's sole argument regarding the inference of causation based upon the timing of his report and the date of termination must be rejected.

Importantly, "evidence that the employer was aware that the plaintiff had engaged in the protected activity" is "[e]ssential to a causal link." *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 70 (2000). "This requires evidence from which a reasonable factfinder can infer the decision maker (or at least one of them if more than one) in the challenged action was aware of the protected activity." *Pinder v. Empl. Dev. Dep't*, 227 F. Supp. 3d 1123 (E.D. Cal. 2017) (citing *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003), *opinion amended on denial of reh'g*, No. 00-35999, 2003 WL 21027351 (9th Cir. May 8, 2003)). For example, the Ninth Circuit determined that where there was "no evidence that any company official or employee who had knowledge" of the plaintiff's protected activity "had any part in the…decision" resulting in an adverse action, no causal inference could be made. *See Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 797 (9th Cir. 1982) (explaining lack of knowledge "breaks the requisite causal link"). Here, the only identified protected activities— supported by the evidence— occurred well before Stockwell became the Interim City Manager on November 28, 2017. Plaintiff fails to identify any evidence that Stockwell was aware Plaintiff made

---

[10] There is no evidence identified supporting the Plaintiff's assertion that he reported racial discrimination or another other protected report to the City Attorney.

allegations of racial discrimination to Human Resources prior to his decision to terminate Plaintiff. Because it is undisputed that Stockwell alone made the decision to terminate Plaintiff's employment (DSF 105, 108; *see* Doc. 39-1 at 13) Plaintiff fails to show the decision-maker was aware of his protected activity.

In light of Plaintiff's failure to identify evidence that links his protected activity to the adverse action, the Court finds Plaintiff fails to establish an essential element of his claim for retaliation in violation of FEHA. For this reason, summary adjudication of the sixth cause of action is appropriate.

### 3. Defendant's legitimate, non-discriminatory reasons

Assuming Plaintiff carried the burden to state a prima facie case of discrimination and retaliation under FEHA—which he has not—the Court also considers whether the City has identified legitimate, non-discriminatory reasons for the adverse action. The City asserts that it was not motivated by a discriminatory or retaliatory animus toward Plaintiff when the decision was made to terminate his employment as Fire Chief. (Doc. 38-1 at 23) Stockwell reported that the reasons he terminated Plaintiff's employment were as follows:

> • Plaintiff's conduct was unbecoming a director including, but not limited to, (i) appearing at City Hall more than appropriate and gossiping with other City staff members, including about Plaintiff's belief that Wood was having an affair and (ii) having an inappropriate confrontation with a citizen in the City Hall foyer;
>
> • Plaintiff involved himself in police activity including, but not limited to, responding to police calls at night and bragging that he had dragged two students out of their classrooms; and
>
> • Plaintiff's inability to understand the financial constraints of the City, including submitting a request for millions of dollars in funding and placing a ladder truck on the City Council agenda without permission after a parcel tax proposal failed that could cause the City to have to lay off significant amounts of staff members.

(DSF 109; *see also* Doc. 38-7 at 5-6, Stockwell Decl., ¶ 27)

Notably, "legitimate" reasons "need not necessarily have been wise or correct," but instead merely need to be "facially unrelated to prohibited bias." *Oliver v. Microsoft Corp.*, 966 F. Supp. 2d 889, 889 (N.D. Cal. 2013) (quoting *Guz*, 24 Cal. 4th at 356, 358) There is no dispute that the reasons identified above are not facially related to a prohibited bias. Further, the Ninth Circuit affirmed summary judgment in favor of a defendant who terminated an employee for unbecoming conduct. *See, e.g.*, *Miller v. UPS, Inc.*, 2004 WL 1771571 at *6-7 (noting UPS terminated the plaintiff's employment

for "conduct unbecoming" a manager, which was a legitimate reason for termination, and granting summary judgment in favor of UPS) *aff'd by Miller v. UPS*, 196 Fed. Appx. 489, 490 (9th Cir. 2006). Thus, the City carries its burden to identify legitimate and non-discriminatory reasons for Plaintiff's termination from the position of Fire Chief.

### 4. Pretext

"A plaintiff can show pretext directly, by showing that discrimination [or retaliation] more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez*, v. County of Los Angeles, 349 F.3d 634, 641 (9th Cir. 2003); *see also Coghlan v. Am. Seafoods Co.,* 413 F.3d 1090, 1094-95 (9th Cir. 2005). Direct evidence typically consists of retaliatory statements or actions by the employer. *Coghlan*, 413 F.3d at 1095. Indirect evidence "requires an additional inferential step" to establish retaliation. *Id.*

Plaintiff contends "[a]ll three of the proffered reasons should be seen as pretext for unlawful discrimination." (Doc. 39 at 26) According to Plaintiff, the allegation that he "appeared at City Hall more than appropriate, gossiped about Mayor Wood having an affair and had a confrontation with a citizen in the City Hall Foyer... should be given no weight." (*Id.*) Plaintiff contends

> This allegation is not worthy of credence because: (1) this was not brought to Plaintiff's attention before he was terminated; (2) Plaintiff was the Fire Chief and had a multitude of reasons to appear at City Hall on a regular basis. Stockwell was only in his position for a few weeks when he terminated Plaintiff, so he lacked the knowledge as to why Plaintiff needed to visit City Hall; and (3) the only complaint about Plaintiff from a member of the public came from Mr. Meister who was complaining that Plaintiff would not relax the Fire Code and had reported Meister's attempt to bribe him (PDMF ¶ 117) (PRSE ¶ 104) As Stockwell's landord [sic], it appears Mr. Meister may have received preferential treatment from Stockwell. (PDMF ¶¶ 146-148)

(Doc. 39 at 26) Once again, however, the *undisputed* evidence before the Court contradicts Plaintiff's claims. Indeed, Plaintiff admitted that he was told by Tom Weil to stop spreading the rumor about Wood prior to Weil's retirement. (UMF 29; *see also* Doc. 41-5 at 36, Vincent Depo. 86:18-24) He again was informed, in writing, of a "potential disciplinary conference" because it was "reported ... that, while at City Hall in an open office environment, you made comments to the affect that a member of the City Council was involved in an improper relationship with a city employee." (UMF 44; *see also* Doc. 38-7 at 9, Stockwell Decl., Exh. A) Thus, Plaintiff's conduct was brought to his attention twice— by two different city managers. For this reason alone, the Court finds Plaintiff fails to demonstrate the

reason identified by the City predicated on "conduct unbecoming a director" was pretext and declines to identify further instances in which the evidence contracts his assertions or fails to offer support.

**V.      Conclusion and Order**

As set forth above, Plaintiff fails to identify evidence that establishes essential elements of his claims for retaliation, discrimination, and the Firefighter's Bill of Rights. Because there are no genuine issues of material fact related to Plaintiff's claims, summary judgment is appropriate. *Celotex*, 477 U.S. at 322.

Based upon the foregoing, the Court **ORDERS**: Defendant's motion for summary judgment (Doc. 38) is **GRANTED**.

IT IS SO ORDERED.

Dated:   **August 2, 2019**                            **/s/ Jennifer L. Thurston**
                                                                    UNITED STATES MAGISTRATE JUDGE